UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMIE M.,[1] | ) |
| | ) No. 22 CV 5015 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| LELAND DUDEK, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) May 7, 2025 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Jamie M. seeks social security income benefits ("SSI") asserting that she is disabled by fibromyalgia, postural orthostatic tachycardia syndrome ("POTS"), dysautonomia, migraines, obesity, and bipolar and anxiety disorders. She brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her application for benefits. For the following reasons, Jamie's remand request is denied:

**Procedural History**

Jamie filed her SSI application in December 2019 claiming disability onset on November 30, 2017. (Administrative Record ("A.R.") 15.) After her application was denied initially and upon reconsideration at the administrative level, (id. at 101, 108), she sought and was granted a hearing before an Administrative Law Judge ("ALJ"), (id. at 110, 142-46). Jamie appeared with her attorney at an October 27, 2021

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Jamie's first name and last initial in this opinion to protect her privacy to the extent possible.

telephonic hearing at which she and a vocational expert ("VE") testified. (Id. at 33-63.) The ALJ ruled in December 2021 that Jamie is not disabled because she can perform both her past work as a customer care representative and other jobs that exist in significant numbers in the national economy. (Id. at 15-28.) The Appeals Council denied Jamie's request for review, (id. at 1-3), making the ALJ's decision the final decision of the Commissioner, *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Jamie then filed this action seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 8).

## Analysis

Jamie argues that the ALJ erred when: (1) discounting the opinions of her treating therapist, Anna Czerniak, and treating cardiologist, Dr. Saifullah Nasir; (2) assessing her subjective symptoms; (3) finding her only mildly limited in the paragraph B criteria and deeming her fibromyalgia not listings-level severe; and (4) crafting her residual functional capacity ("RFC"). (See generally R. 18, Pl.'s Mem.) When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and the decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from reweighing the evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels" it. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation

omitted). However, the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations," *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021), and "provide an explanation . . . that is 'sufficient to allow [the] reviewing court[] to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review,'" *Warnell v. O'Malley,* 97 F.4th 1050, 1054 (7th Cir. 2024) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). To warrant reversal, a claimant must do more than "nitpick the ALJ's order." *Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024). Instead, a claimant "must demonstrate with references to evidence why the ALJ's determinations lack substantial support." *Id.* Viewing the record under this standard, remand is not warranted.

**A.     Opinion Evidence**

The court addresses Jamie's arguments concerning the opinion evidence first because any error here would require a reassessment of the RFC. An ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, he must assess the persuasiveness of all medical opinions by considering and explaining the most important factors—supportability and consistency. 20 C.F.R. §§ 404.1520c, 416.920c(b)(2); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). The supportability factor requires consideration of the objective medical evidence and explanations presented and used by the medical source, 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1), while the consistency factor directs the ALJ to assess how the opinion

3

is consistent with all other medical and nonmedical sources, 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ also may, but is not required to, explain how he considered the medical source's specializations and relationship with the claimant and any other factors that tend to support or contradict the source's opinion. 20 C.F.R. §§ 404.1520c, 416.920c(b)(2).

The ALJ here found the state agency consultants' opinions "persuasive" but not Jamie's treating therapist Anna Czerniak's and cardiologist Dr. Nasir's opinions, except for certain lifting restrictions. (A.R. 24-26.) The state agency consultants found in October 2020 and April 2021 that Jamie can perform light work with the following physical and environmental limitations: push, pull, lift, and carry up to 20 pounds occasionally and 10 pounds frequently; sit and stand and/or walk for up to 6 of 8 hours; never climb ladders, ropes, or scaffolds; occasionally stoop; and avoid concentrated exposure to hazards. (Id. at 71-73, 89-92.) The consultants also found Jamie mildly limited in interacting with others, concentrating, persisting, and maintaining pace ("CPP"), and understanding, remembering, or applying information, and determined that her bipolar and anxiety disorders are non-severe. (Id. at 69, 85-86.)

By contrast, Dr. Nasir opined in May 2020 that despite treating Jamie's POTS since 2018 "with some improvement," she remains "unable to work" because of continued "lightheadedness [and] dizziness" and difficulty concentrating, standing, lifting, and performing daily activities. (Id. at 295.) Dr. Nasir also found in October 2021 that Jamie's dysautonomia and hypertension cause shortness of breath, fatigue,

4

weakness, nausea, dizziness, palpitations, and sweatiness, and he described her prognosis as "fair." (Id. at 588.) He then opined that Jamie is markedly limited in physical activity, limited in social interactions, and can sit for 20 minutes at a time for 4 hours total per workday and stand/walk for 2 hours total per workday. (Id. at 588-90.) Dr. Nasir further opined that Jamie must be able to shift positions at will, take 20-minute breaks every 20-30 minutes, will miss work 4 days a month, and that CPP difficulties would frequently interfere with her ability to perform even simple work tasks. (Id. at 589-90.)

Also in October 2021, therapist Czerniak opined that Jamie is markedly limited in cognitive functioning, interactions with others, and CPP, frequently fails to complete tasks, and cannot function in a competitive work setting. (Id. at 623.) Additionally, Czerniak cited Jamie's own reports that she cannot sit or stand for 20 minutes without "shaking, sweating, [and experiencing] occasional dizziness[] and presyncope." (Id. at 623-24.)

After finding that Jamie suffers from severe fibromyalgia, POTS, dysautonomia dysfunction, migraines, and obesity, and non-severe bipolar and anxiety disorders, the ALJ adopted an RFC similar to that of the state agency psychologists, finding Jamie capable of light work with the following restrictions:

> lift, carry, push, and/or pull up to 20 pounds occasionally and up to 10 pounds frequently, stand and/or walk up to 6 out of 8 hours, and sit up to 6 out of 8 hours with normal breaks; no ladders, ropes, or scaffolds, occasional ramps and stairs, occasional balance, stoop, kneel, crouch, and crawl; no exposure to unprotected heights, moving mechanical parts, or vibration; and in a moderate noise environment.

(Id. at 20.) The ALJ also found Jamie mildly limited in each of the paragraph B criteria. (Id. at 18-19.)

Jamie argues that the ALJ improperly rejected Czerniak's opinion and, as a result, did not adequately account for her mental limitations in the RFC. (R. 18, Pl.'s Mem. at 8.) But the ALJ considered both required factors in evaluating Czerniak's opinion, and found it "unsupported by any objective findings," "inconsistent with other evidence of record," and "excessive." (A.R. 25.) The ALJ cited ample evidence for support, noting that Czerniak relied only on Jamie's self-reports in formulating her opinion, Czerniak's notes do not reflect objective findings, and other evidence conflicts with her assessment. (Id.) To be sure, despite Czerniak's finding Jamie markedly limited in cognitive functioning and that the record reflects some complaints of brain fog and confusion, Jamie otherwise often denied the same symptoms, the ALJ pointed out that Jamie's mental status examinations ("MSEs") indicate intact memory, alertness, orientation to person, place, and time, and normal thought content, and—except for one memory test—Jamie's consultative psychological exam was normal. (Id. at 18, 25 (citing id. at 407, 423, 457, 468, 508, 395, 400, 412, 425, 462, 470, 479, 490, 495, 510, 526, 534, 614).)

Plus, while Czerniak concluded that Jamie is markedly limited in interacting with others and Jamie reported that anxiety at times prevents her from socializing or grocery shopping, the ALJ found that the record otherwise reflects "no significant problem" with Jamie's "ability to relate to or work with others" and her MSEs generally reflect appropriate behavior, normal mood and speech, pleasant demeanor,

6

good eye contact, and no problem with cooperation. (Id. at 18, 25-26 (citing id. at 400, 425, 470, 480, 490, 495, 534).) Also, after noting Czerniak's opinion that Jamie is markedly limited in CPP and Jamie's testimony that she experiences daily problems with focus and attention, the ALJ pointed out that Jamie denied the same symptoms to her providers, her MSEs generally reflect "normal attention and concentration, normal and linear thought process," and she performed successfully "on most tests requiring sustained attention and concentration." (Id. at 18, 26 (citing id. at 400, 479, 495, 534, 614).)

Nevertheless, Jamie complains that the ALJ relied on MSEs conducted during treatment visits, not on the job, and argues it was improper to fixate on them. (R. 18, Pl.'s Mem. at 9.) As the government correctly points out, however, Jamie would be "hard pressed" to find a disability claimant "working full-time . . . whose physician traveled to their workplace to document their observations." (R. 24, Govt.'s Mem. at 6.) Moreover, it is Jamie's burden to prove disability. *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *see also* 20 C.F.R. § 404.1512 (placing the "[r]esponsibility for evidence" on the claimant). Yet she points to no evidence the ALJ failed to address that requires a different result. *Deborah M.*, 994 F.3d at 788.

And despite Jamie's suggestion to the contrary, (R. 18, Pl.'s Mem. at 9), the ALJ took note of Jamie's six-month treatment relationship with Czerniak, (A.R. 24). While Jamie complains that the ALJ "neglected to mention" Czerniak's "in-depth testing," (R. 18, Pl.'s Mem. at 9), the "tests" to which she refers were based solely on

Jamie's self-reports, as Czerniak acknowledges, (A.R. 592 (noting assessments supply a "self-report"-based rating of mental health symptoms)).

Jamie next suggests that the ALJ should have given more weight to Czerniak's opinion because Dr. Nasir similarly endorsed marked deficits in work-related mental functioning based on his findings that Jamie's CPP symptoms would frequently interfere with simple work tasks and require frequent breaks and absenteeism. (R. 18, Pl.'s Mem. at 10 (citing A.R. 588-91).) But as with Czerniak's opinion, the ALJ concluded that Dr. Nasir's opinion was neither properly supported nor consistent with the record. (A.R. 24-25.) Indeed, in many instances, Dr. Nasir's opinion conflicts with his own treatment notes, which largely reflect normal mental and physical examinations and Jamie's denials of symptoms about which she complains here. (Id.; see also id. at 297, 299, 301, 303, 356, 545, 547, 549 (reflecting on review of symptoms, no headaches, vertigo, eye, ear, or neck issues, syncope, muscle or joint pain, heart issues, depressive symptoms, and normal physical exam).) Substantial evidence supports the ALJ's assessment of the opinion evidence.

B.    **Subjective Symptom Assessment**

Jamie also challenges the ALJ's subjective symptom assessment. An ALJ's symptom evaluation is entitled to great deference and may only be reversed where "patently wrong." *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014). But the ALJ may not disregard subjective complaints "solely because they are not substantiated by objective medical evidence," *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015), and must consider factors such as medication efficacy and side effects,

8

daily activities, treatment received, and precipitating pain factors, SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017). That said, the court will not disturb a symptom evaluation that is logically based on specific findings and evidence. *See Murphy*, 759 F.3d at 815. The ALJ's assessment satisfies that standard here.

Jamie argues that the ALJ improperly "attempted to minimize" and "rejected" her subjective complaints. (R. 18, Pl.'s Mem. at 8.) Yet the ALJ committed no error. First, he acknowledged Jamie's allegations, including dizziness, nausea, constant headaches, falls, rapid heartbeat, sweating, pain, fatigue, CPP problems, difficulty sitting and standing, worsening symptoms after bending down, neck spasms and peripheral vision issues while driving, crying spells, and social anxiety. (A.R. 21-23.) He also noted Jamie's testimony that she experiences "loss of vision," "f[e]ll[] out of her chair," needs 15-minute unscheduled breaks at work, "lost her job due to attendance problems," and at least twice a month must rest for a day or two after an otherwise good day. (Id. at 21.)

But the ALJ identified numerous inconsistencies between these complaints and the treatment record. Despite Jamie's claim of frequent—and in some cases constant—symptoms, she often denied headaches, dizziness, syncope, fatigue, lightheadedness, problems with gait and balance, and decreased concentration, and her mental and physical examinations were typically normal. (Id. at 23-26.) Moreover, the ALJ observed that the record reflects no complaints about vision problems or neck spasms while driving, no visits for falls, and no symptoms during postural testing. (Id. at 22-23 (no symptoms during tilt table test), 25 ("no difficulty

9

standing, bending, sitting," and no limitation in ambulation or activity during independent medical examination).)

The ALJ also considered Jamie's treatment and medication. He noted that as of February 2021, Jamie had not tried daily preventative headache medication, generally takes Xanax only once a month, did not follow up on a neurologist's February 2021 recommendation to see a psychiatrist, and did not pursue counseling until March 2021. (Id. at 23-24, 26.) The ALJ continued that despite alleging a "lack of access to care" because of insurance issues, Jamie apparently did not pursue free or low-cost care. (Id. at 24.) And in addition to Jamie's inconsistent reporting of physical symptoms and generally normal exams, her providers reported her fibromyalgia and hypermobility symptoms improved with Celebrex, and her POTS and dysautonomia symptoms improved with blood pressure medications. (Id. at 23.)

Jamie complains that the ALJ should have explained what more could be done for headaches and how the "absence of psychiatric care equates to an absence of psychiatric problems" before counting both against her. (R. 18, Pl.'s Mem. at 11.) She also emphasizes showing "improvement" in these areas does not render her capable of full-time work. (Id. at 13.) Yet the ALJ noted Botox was a suggested treatment for headaches but observed that Jamie's insurance seemingly did not approve it, (A.R. 23), and rather than concluding that Jamie had no psychiatric problems, the ALJ simply construed Jamie's failure to pursue alternative low-cost treatment as evidence casting doubt on the intensity of her symptoms, (id. at 23-24). And the ALJ was permitted to consider how Jamie's physical symptoms improved with medication. *See*

10

SSR 16-3p, 2017 WL 5180304, at *7-8 (requiring ALJ to consider medication efficacy and treatment received).

In the end, the ALJ accepted and accounted for many of Jamie's symptoms in the RFC, specifically crediting her complaints of dizziness, nausea, rapid heartbeat, pain, fatigue, headaches, and obesity. (Id. at 24.) But he discounted the severity of these symptoms based on substantial evidence that is inconsistent with the same. Even if the ALJ emphasized Jamie's treatment or lack thereof too much, an "ALJ's credibility assessment need not be perfect; it just cannot be patently wrong." *Dawson v. Colvin*, No. 11 CV 6671, 2014 WL 1392974, at *10 (N.D. Ill. April 14, 2014). The ALJ met that low bar in this case.

**C.    Step Two and Three Findings**

Jamie argues that the ALJ's step two findings are "flawed" and "unsupported," (R. 18, Pl.'s Mem. at 8), and discussion of fibromyalgia at step three was "rather perfunctory," (id. at 12). But so too are her arguments, which are accordingly deemed waived. *Crespo v. Colvin*, 824 F.3d 667, 673 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments . . . are waived."). Moreover, as the government points out, there is no listing for fibromyalgia, (R. 24, Govt.'s Mem. at 12), and Jamie fails to explain how her conditions meet or equal any listing, *Sosinski v. Saul*, 811 Fed. Appx. 380, 381 (7th Cir. 2020) (noting that reversal for failure to conduct listings analysis is improper if "claimant fails to show that he meets the criteria for that listing"). In any case, the ALJ considered whether Jamie's conditions met several listings. (A.R. 19-20.) And after weighing the opinion, objective and subjective evidence, the

11

ALJ concluded that Jamie was only mildly limited in each of the broad functional areas. (Id. at 18-19.) The court finds no error in his analysis of the paragraph B criteria.

### D. Physical RFC Assessment

Jamie also complains about the ALJ's physical RFC assessment. An RFC measures the tasks a person can perform given her limitations based on "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper*, 712 F.3d at 362. The ALJ must incorporate a claimant's limitations, including those that are not severe, in the RFC and may not simply dismiss a line of evidence that is contrary to the ruling. *See Bruno v. Saul*, 817 Fed. Appx. 238, 242 (7th Cir. 2020); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In so doing, the ALJ must "say enough to enable review of whether [he] considered the totality of a claimant's limitations," *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022), providing a "logical bridge" between the evidence and his conclusions, *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021).

Jamie argues that the ALJ here failed to "assess limitations from all impairments, in combination," because he did not address how her fibromyalgia would "act in concert with other impairments to impede [her] functional capacity." (R. 18, Pl.'s Mem. at 12.) She says the ALJ's "discounting of [her] subjective complaints of severe pain and fatigue reflect an utter misunderstanding of fibromyalgia" and her "other severe impairments." (Id.) Fibromyalgia is a "chronic health condition that causes pain all over the body" along with symptoms such as

12

severe fatigue, sleep issues, and problems with memory or clear thinking. *Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1137 (7th Cir. 2017) (citation omitted). Because fibromyalgia symptoms are "entirely subjective," *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996), the condition is "notoriously difficult to assess," *Swiecichowski v. Dudek*, 133 F.4th 751, 757 (7th Cir. 2025). As Jamie points out, the severity of fibromyalgia pain "cannot be measured with objective tests aside from a trigger-point assessment." (R. 18, Pl.'s Mem. at 12); *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018). Accordingly, the Social Security Administration has issued guidance regarding fibromyalgia. First, to establish fibromyalgia as a "medically determinable impairment," the claimant must point to a diagnosis and provide evidence of certain diagnostic criteria. SSR 12-2p, 2012 WL 3104869, at *1-3 (July 25, 2012). Then, the ALJ must determine whether fibromyalgia could reasonably be expected to produce the symptoms alleged and evaluate the "intensity and persistence of those symptoms." *Id.* at *5; SSR 16-3p, 82 Fed. Reg. 49462-03 (Oct. 25, 2017). When incorporating fibromyalgia symptoms into the RFC the ALJ must "consider a longitudinal record whenever possible" since symptoms "wax and wane," producing "bad days and good days." SSR 12-2p, 2012 WL 3104869, at *6.

Here, the ALJ found that Jamie's fibromyalgia was a severe impairment capable of producing the symptoms she alleged, (A.R. 17, 21), but her "statements concerning the intensity, persistence and limiting effects" of those symptoms were "not entirely consistent" with the medical and other record evidence. (Id. at 21-22.) The court already explained why that finding was not an error. And whether because

13

of fibromyalgia or some other reason, the ALJ did consider Jamie's symptoms on a longitudinal basis, but still did not find support for a more restrictive RFC. Jamie points to no evidence that requires a different result. *See Deborah M.*, 994 F.3d at 788 (reversal is proper "only if the record compels it"). And in any event, the VE in this case determined that jobs exist in significant numbers in the national economy even if Jamie's RFC is reduced to sedentary work. (A.R. 57-58.) Because Jamie's complaints amount to a request to reweigh substantial evidence, remand is not proper. *See Bertha M. v.* Saul, 395 F. Supp. 3d 963, 971 (N.D. Ill. 2019) (no remand where ALJ "engaged with both sides of the record and weighed the evidence in a different way than plaintiff would have liked").

### E.     Mental RFC Assessment

Finally, Jamie complains that the ALJ found mild mental limitations in each of the paragraph B criteria yet did not account for them in her RFC or explain why functional limitations were not required. (R. 18, Pl.'s Mem. at 10.) Jamie is correct that the ALJ must explain why functional RFC restrictions are unnecessary if he finds paragraph B limitations at step two. And here, the ALJ's step two analysis includes a familiar boilerplate assuring such a discussion is forthcoming:

> [t]he limitations identified in the "paragraph B" criteria are not a [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual capacity assessment used at steps 4 and 5 . . . requires a more detailed assessment. The following [RFC] assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

(A.R. 19.) Yet the mental RFC assessment that follows is less than the "more detailed" one the ALJ promises. The ALJ simply: (1) concluded that the state agency

14

consultants' opinions that Jamie had no work-related mental limitation were persuasive, explaining only that the "hearing level evidence supports no greater limitation;" (2) noted that the psychological consultative examiner's results were "completely within normal limits" and that the examiner did not specify any functional limitations; and (3) reiterated that Czerniak's opinion of marked limitations in three of the four paragraph B criteria was not supported by objective evidence, which he found reflects only mild limitations. (Id. at 25-26.) As such, the ALJ provides little color for his conclusion that Jamie requires no functional mental limitations despite finding some mild mental deficits, and in some respect seems to conflate the two inquiries.

However, the ALJ posed a hypothetical to the VE that affixed mental limitations to the RFC ultimately assessed in this case. (Id. at 55-56 (hypothetical including among other things limitation to simple tasks, work-related decisions, and judgment in a low-stress environment without hourly quotas).) Under this more restrictive RFC, the VE concluded that while Jamie's past work was not possible, other jobs identified as suitable work would exist in significant numbers for an individual who has these limitations.[2] (Id.) Accordingly, remand is not proper on this basis either. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("[W]e

---

[2] The ALJ's hypothetical does not include an interaction limitation, but even if Jamie requires one, two of the jobs the ALJ ultimately found she could perform involve little interaction. *See Mail Clerk*, DOT 209.687-026, 1991 WL 671813 (4th ed. 1991) (indicating interaction with people is "not significant"); *Laundry Sorter*, DOT 361.687-014, 1991 WL 672991 (4th ed. 1991) (same).

will not remand a case . . . where we are convinced that the ALJ will reach the same result.").

## Conclusion

For the foregoing reasons, Jamie's remand request is denied, and the Commissioner's decision is affirmed.

**ENTER:**

_____
**Young B. Kim
United States Magistrate**